1
2
3
4
5
6
7

8        UNITED STATES DISTRICT COURT

9        SOUTHERN DISTRICT OF CALIFORNIA

10

11  L ALD LLC, a Florida Limited Liability
    Company,                                    Case No.:  24-CV-02195-GPC-MSB
12
                            Plaintiff,          **ORDER DENYING MOTION FOR**
13                                              **PRELIMINARY INJUNCTION**
    v.
14                                              **[ECF No. 3]**
    REBEKAH M. GRAY, an individual;
15  MERLIN PUBLISHING LLC, a Texas
    Limited Liability Company d/b/a
16  MERLIN'S PEN PUBLISHING;
    GATEKEEPER PRESS, a Florida Limited
17  Liability Company; INGRAM
    INDUSTRIES INC., a Tennessee
18  corporation d/b/a INGRAM CONTENT
    GROUP and/or LIGHTNING SOURCE;
19
    HATCHETTE BOOK GROUP, a New
20  York corporation; and DOES 1-50,
    inclusive,
21
                            Defendants.
22

23

24

25        Before the Court is a motion for preliminary injunction filed by Plaintiff L ALD

26  LLC ("Plaintiff") against Defendants Rebekah M. Gray, Merlin Publishing LLC, d/b/a

27

28                                       1

1   Merlin's Pen Publishing; Gatekeeper Press; Ingram Industries Inc., d/b/a Ingram Content
2   Group and/or Lightning Source; Hatchette Book Group, collectively "Defendants."  ECF
3   No. 3 ("Mot.").  The motion has been fully briefed.  Defendants filed an opposition on
4   December 13, 2024.  ECF No. 9.  Plaintiff filed a reply on December 23, 2024.  ECF No.
5   17. The Court finds the matter suitable for determination on the papers without a hearing.
6        Based upon a review of the briefs, the supporting documentation, the applicable
7   law, and for the foregoing reasons, the Court hereby **DENIES** Plaintiff's motion for
8   preliminary injunction.

9                              **BACKGROUND**

10       This is a copyright infringement controversy involving several works of young
11  adult fiction.  Without making any findings as to the truth of the allegations, the Court
12  details the parties' claimed factual events below.

13       Rebekah Gray is an author who writes YA fiction under the pen name RM Gray.
14  She began writing *Nightweaver* in 2020 and self-published it in October 2023.  Response
15  at 3.  It was recently picked up by Hatchette, one of the largest publishing companies in
16  the United States, and is scheduled to be published in a deluxe limited edition in March
17  2025, having been available for preorder since July 2024.  *Id.* at 3, 4.  *Nightweaver* is
18  meant to be the first novel of a three-book series written by Gray and published by
19  Hatchette, and Gray is under contract to deliver to Hatchette, by January 2025, the second
20  book, which is then expected to be published nine months after the deluxe limited edition
21  of *Nightweaver*.  *Id*.

22       According to Gray, she began writing *Nightweaver* in January 2020, and
23  completed a substantial draft of the novel by October 2020 – more than one year before
24  Plaintiff claims it wrote the opening chapters of its first book. Gray Decl. ¶¶ 12, 14.  This
25  October 2020 version already contained many of the allegedly infringing elements.
26  Response at 4.  Gray then sent a complete manuscript to her editor on June 13, 2022,

27
28

24-CV-02195-GPC-MSB

before Plaintiff's first book was finished and before any part of the second book had been written.  *See* Compl. ¶ 38.  This June 2022 manuscript contained all of the allegedly infringing elements.  Response at 4.   Gray maintains that throughout this process, before she received a cease-and-desist letter, she had never heard of the Aldrich sisters, their pseudonym "Liz Ald," or any of their books.  Gray Decl. ¶¶ 27-30.

Under the pseudonym "Liz Ald," sisters Lesley and Lindsey Aldrich write young adult ("YA") novels.  They have authored a three-novel series, the first two of which are at issue here: *The Boy with the Beautiful Name* ("Book 1") and *The Boy with the Beautiful Soul* ("Book 2").  Mot. at 2.

According to Plaintiff, a portion of Book 1 was first posted on the website Wattpad on January 8, 2022.  Compl. ¶¶ 18, 38.  Wattpad is an "interactive web-novel platform," where authors can publish their content.  Mot. at 3.  Plaintiff then posted multiple chapters each month on Wattpad, with the entire book posted to the website by July 2022.  Compl. ¶ 38.  A portion of Book 2 was first posted to Wattpad on August 5, 2022, and the entire book was posted on Wattpad by March 2023.  Compl. ¶ 38.

On February 5, 2024, Lesley Aldrich obtained registered copyrights for both books and then transferred the interests in these copyrights to L ALD LLC, the entity that she owns with her sister.  Compl. ¶ 22.

At some point in time, Lesley Aldrich states that she noticed similarities between *Nightweaver* and Book 1 and Book 2, including plot, character, and setting similarities.  Mot. at 4-5.  On March 20, 2024, then-counsel for Plaintiff sent a cease-and-desist letter to Gray and Gatekeeper Press, LLC, among others, asserting copyright infringement.  Mot. at 7.  This letter was sent five months after *Nightweaver* was first published.  Gray's counsel responded to the letter, stating that Plaintiff's allegations were "without legal and evidentiary support" and that Gray would continue to sell and distribute *Nightweaver.*  Aldrich Decl., Ex. 9 at 3-4.  On April 10, 2024, Gray's counsel forwarded to Plaintiff the

3

June 2022 email in which Gray submitted a complete manuscript of *Nightweaver* to her editor. Declaration of Alyssa M. LaCourse ("LaCourse Decl."). Plaintiff's then-counsel acknowledged recipient, but then neither Plaintiff nor counsel communicated with Gray again. *Id.* ¶ 6.

After reviewing the provided email attachment and Word document that Gray's counsel had sent over, Lesley and Lindsey Aldrich allege that they discovered peculiarities from the metadata of the manuscript. Mot. at 7. Lesley Aldrich asserts that the properties of the Word document revealed: "(1) its timed stamped creation time occurred after the email to which it was attached to was sent; and (2) this 100,000-word document showed that in its lifetime the document had only 2 revisions and a total editing time of 2 minutes." *Id.* From this, Lesley and Lindsey Aldrich believed that Gray had manipulated the Word document manuscript to make it appear like its creation pre-dated Plaintiff's works. *Id.*

On November 25, 2024, Plaintiff moved for preliminary injunction to enjoin Defendants "from offering for sale on any medium the novel titled *Nightweaver* by RM Gray." This motion is before the Court now.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Def. Council*, 555 U.S. 7, 24 (2008) (citation omitted). Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (citation omitted). As such, the "grant of a preliminary injunction is a matter committed to the discretion of the trial judge[.]" *Evans v. Shoshone–Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1307 (9th Cir. 2013) (citation omitted). "In exercising their sound discretion," district courts "should pay particular regard for the public consequences in employing the

24-CV-02195-GPC-MSB

1  extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312

2  (1982).

3      District courts exercise this discretion according to a four-factor test rooted in well-

4  established principles of equity. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391

5  (2006). The moving party must show: (1) a likelihood of success on the merits; (2) a

6  likelihood of irreparable harm to the moving party in the absence of preliminary relief;

7  (3) that the balance of equities tips in the moving party's favor; and (4) that an injunction

8  is in the public interest. *Winter*, 555 U.S. at 20.

9      Under the Ninth Circuit's "sliding scale" approach, "the elements of the

10  preliminary injunction test are balanced, so that a stronger showing of one element may

11  offset a weaker showing of another." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir.

12  2012) (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

13  That being so, all four elements must be satisfied. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31

14  F.4th 1180 (9th Cir. 2022). The moving party carries the burden to meet the four *Winter*

15  prongs. *All. for the Wild Rockies,* 632 F.3d at 1135.

                                **DISCUSSION**

17      As a threshold matter, the Court finds that the Plaintiff seeks a prohibitory rather

18  than mandatory injunction. A preliminary injunction can either be *prohibitory*,

19  prohibiting a party from taking action and preserving the status quo pending a

20  determination of the action on the merits, or *mandatory*, ordering a responsible party to

21  take action. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873,

22  878–79 (9th Cir. 2009) (internal quotation marks and citations omitted). A mandatory

23  injunction is "particularly disfavored." *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir.

24  2015) (en banc) (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994

25  (internal citations omitted)). Defendants contend that Plaintiff is seeking a mandatory

26  injunction. Opp. at 11. A district court should deny a mandatory injunction, "unless the

27

28

24-CV-02195-GPC-MSB

1   facts and law clearly favor the moving party." *Park Vill. Apartment Tenants Ass'n v.*
2   *Mortimer Howard Trust*, 636 F.3d 1150, 1161 (9th Cir. 2011).

3       Put simply, prohibitory injunctions preserve the status quo and mandatory
4   injunctions "go[] well beyond simply maintaining the status quo." *Anderson v. United*
5   *States*, 612 F.2d 1112, 1114 (9th Cir. 1980).   However, the distinguishing line between
6   prohibitory injunctions and mandatory injunctions is not always so clear. *Compare* 42
7   Am. Jurisprudence 2d *Injunctions* § 5 (2017) ("An injunction is considered prohibitory
8   when the thing complained of results from present and continuing affirmative acts and
9   the injunction merely orders the defendant to *refrain from doing those acts*.") (emphasis
10  added) *with* 42 Am. Jurisprudence 2d *Injunctions* § 6 (2017) ("The person named in a
11  mandatory injunction must undo the wrong or injury with which he or she is charged.
12  This may involve, for example, the undoing of illegal acts or *restraining the performance*
13  *of an act*.") (emphasis added).

14      The status quo "refers not simply to any situation before the filing of a lawsuit but
15  instead to the last uncontested status which preceded the pending controversy."
16  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (citations and
17  internal quotations omitted); *see O Centro Espirita Beneficiente Uniao Do Vegetal v.*
18  *Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004), *aff'd*, 546 U.S. 418 (2006) (McConnell, J.,
19  concurring in part and dissenting in part) ("Status quo does not mean the situation
20  existing at the moment the law suit is filed, but the last peaceable uncontested status
21  existing between the parties before the dispute developed.") (internal quotation marks
22  omitted).

23      Here, Plaintiff seeks a preliminary injunction that would enjoin Defendants "from
24  offering for sale on any medium the novel titled *Nightweaver* by RM Gray."  Mot. at 1.
25  This is a prohibitory injunction.  The "status quo" was the state of things *before* the
26  allegedly infringing novel, *Nightweaver*, was being sold.  This was the last peaceable

27
28
                                        6
                                                        24-CV-02195-GPC-MSB

situation between the parties before any dispute developed.  Since Plaintiff seeks a return to this status quo, this is a prohibitory injunction.  Plaintiff does not seek any affirmative action that would go beyond the status quo.

In *Garcia*, the court concluded that the requested injunction was mandatory because it found that Garcia's "requested injunction required Google to take affirmative action – to remove (and to keep removing) [the allegedly infringing video] from YouTube"; in essence, it ordered a "responsible party to take action." *Id.* (citation and internal quotations omitted).  Garcia is distinguishable because the determination of mandatory injunction rested primarily on its finding that Google was enjoined to take *affirmative* action.  Plaintiff, here, is not seeking to affirmatively take down copies of *Nightweaver* from the shelves of bookstores.  It only wants to halt future sales of the novel.

Defendant relies on another case, *Wild v. HarperCollins Publishers LLC*, in which the court determined the injunction was mandatory based on the fact that Defendants would have to "cease production or even recall books." 2013 WL 12137684, at *3 (C.D. Cal. Jan. 2, 2013).  The court cited to *Signeo USA, LLC v. SOL Republic, Inc.*, in which that court said, "To the extent [Plaintiff] seeks a *return* of products already shipped to [Defendant's] distributors and others, it is a mandatory injunction…" 2012 WL 2050412, at *11 (N.D. Cal. June 6, 2012) (emphasis added).  Again, Plaintiff is not seeking a return or recall of *Nightweaver* copies that are already in circulation.  *Compare BBK Tobacco & Foods, LLP v. AIMS Group USA Corp.*, 2024 WL 5078126 (D. Nev. Nov. 25, 2024), at *11 (granting a prohibitory injunction that prohibited defendant from "continuing to infringe" on plaintiff's intellectual property by using infringing names in commerce) *with id.* at *12 (granting a mandatory injunction that ordered the defendant to "recall and destroy all products… that infringe").

1    More persuasive is the Ninth Circuit's logic in *GoTo.com, Inc. v. Walt Disney Co.*
2    Disney was accused of using a logo that was substantially similar to a trademarked logo,
3    so the district court enjoined Disney from using the logo.  On appeal, Disney argued that
4    the injunction was a change in the status quo, and therefore a mandatory injunction, but
5    the Ninth Circuit said that the status quo existed *before* Disney began using its allegedly
6    infringing logo and to hold otherwise would "lead to absurd situations, in which plaintiffs
7    could never bring suit once infringing conduct had begun."  *GoTo.com*, 202 F.3d at 1210.
8    Here, the Court finds that a request to enjoin publication of *Nightweaver* would be a
9    return to the "status quo" and thus prohibitory rather than mandatory. As such, the Court
10    will review the Plaintiff's motion as one seeking a prohibitory injunction.

11    **I.    Likelihood of success on the merits**

12    "The first factor under *Winter* is the most important—likely success on the merits."
13    *Garcia*, 786 F.3d at 740 (citation omitted).  To establish a copyright infringement claim,
14    a plaintiff must prove (1) ownership of the allegedly infringed work; and (2) that the
15    defendant infringed protected aspects of the plaintiff's work.  *Skidmore as Tr. for Randy*
16    *Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020).  The second prong
17    is at issue here, and it requires a plaintiff to show (1) "copying" and (2) "unlawful
18    appropriation."  *Id*.  The Court finds that Plaintiff cannot meet either element.

19    **A.    "Copying" element**

20    Copying can be proven circumstantially, "by showing that the defendant had
21    access to the plaintiff's work and that the two works share similarities probative of
22    copying."  *Skidmore*, 952 F.3d at 1064.  The Court takes each element in turn.

23        1. Access

24    "To prove access, a plaintiff must show a reasonable probability, not a mere
25    possibility, that an alleged infringer had the chance to view the protected work."  *Art*
26    *Attacks Ink, LLC v. MGA Entm't Inc*., 581 F.3d 1138, 1143 (9th Cir. 2009).  Where, as is

27

28

24-CV-02195-GPC-MSB

here, there is no direct evidence of access, "circumstantial evidence can be used to prove access either by (1) establishing a chain of events linking the plaintiff's work and the defendant's access, or (2) showing that the plaintiff's work has been widely disseminated." *Id*.

Plaintiff argues that access is established because of the "widely disseminated" nature of Plaintiff's books, Book 1 and Book 2, on the website Wattpad. Mot. at 12. Plaintiff asserts that Wattpad is a "leading web-novel platform, home to a community spending 26+ billion minutes per month engaged in Wattpad-contributor original stores and other content and has over 650 million authored works on its site, with estimated web traffic in excess of 100 million visits per month." *Id*. Plaintiff also asserts that a simple Google search of Liz Ald's book titles will provide any inquirer with the links to the books, free of charge. *Id*. Because of its general availability on the internet, and specifically on the popular website Wattpad, Plaintiff argues that Defendant Gray had access to the works.

This reasoning falls short. While Plaintiff touts Wattpad's popularity as proof that Plaintiff's works were widely disseminated, there are two issues with this.

<u>First</u>, Plaintiffs have not convinced the Court that Plaintiff's works *themselves* were widely disseminated. While Wattpad, *on aggregate*, is popular and has a lot of web traffic, Plaintiff must prove that Book 1 and Book 2 were widely read and disseminated. Lesley Aldrich, in her declaration, does not state how popular Plaintiff's works became. *See* Aldrich Decl. ¶ 50. She states that Wattpad rewards authors whose novels "perform well (measured as 1 Million+ readers)" but does not state whether Book 1 and Book 2 ever got near that mark. Instead, at some point, she pulled her works from Wattpad, "thus ending [her] potential publishing opportunities on the site." *Id*.

Plaintiff does, in its Complaint, alleges a few specific facts about the popularity of Liz Ald's works: that "Liz Ald's works ranked #1 on Wattpad in its 'Fiction' section for

approximately 12 weeks and Liz Ald's works were frequently featured on Wattpad's homepage," Compl. ¶ 33, and that Liz Ald had "1million+ views for its 3-book YA series," *id.* ¶ 37.

There are several problems with this. There is no "Fiction" section on Wattpad.[1] Instead, there are specific genres listed, including "Romance," "Adventure," "Fantasy," and "Teen Fiction." It's unclear in *which* genre Plaintiff's works were actually ranked #1. Furthermore, in addition to genre categories, there is something called a "tag" on Wattpad. A "tag" is a sub-categorical label within a genre. For example, within the genre of "Teen Fiction," there is a tag called "fiction." From the Court's review of the Wattpad website, the genre "Teen Fiction" has a "Hot List" (top trending list) of about 1,200 stories overall, with a numerical ranking starting with the #1 story.[2] When the tag "fiction" is added to filter the stories, then only 336 stories are listed – and a new #1 story is shown. This means that this story is #1 within the genre of "Teen Fiction" *plus* the added "fiction" tag. Thus, regardless of whatever genre Plaintiff's works were in, if Plaintiff's works were ranked #1 when the "fiction" tag was toggled on, then the fact that Liz Ald's works reached #1 ranking seems less significant, since the "fiction" tag generates a smaller pool of stories. Wattpad authors can calibrate and manipulate the tags they add to their stories in order gain a higher ranking.[3] Again, Plaintiff has not made it clear what ranking #1 in the "'Fiction' section" actually means. But if it refers to the "fiction" tag within a specific genre, then the #1 ranking seems less impressive as a mark of wide dissemination.

---

[1] *See* www.wattpad.com, under the tab "Browse."

[2] *See Wattpad*, "Teen Fiction Stories," https://www.wattpad.com/stories/teenfiction.

[3] "A more frequently used tag will have more stories to compete with, sometimes in the thousands to millions, meaning it's much easier to gain a ranking in a tag that has fewer overall stories attached to it." *Wattpad*, "Story rankings FAQ," https://support.wattpad.com/hc/en-us/articles/360000769623-Story-rankings-FAQ.

24-CV-02195-GPC-MSB

Even more problematically, Plaintiff does not allege *which* of Liz Ald's works ranked #1 on Wattpad's supposed "Fiction" section and which were featured on the homepage. Liz Ald has published at least one other work on Wattpad besides Book 1 and Book 2. *See* Compl. ¶ 26 (Liz Ald "first began using the internet website wattpad.com… in or around July 25, 2020, publishing a different fantasy novel than at issue in this case"). The Complaint is silent about *which* book of Liz Ald – either Book 1, Book 2, the first fantasy novel published on Wattpad, or another Liz Ald book altogether – was ranked #1 or featured on the homepage. This is a key detail, because if a Liz Ald book other than Book 1 or Book 2 was ranked #1, then this alleged #1 ranking is irrelevant to this case: the "widespread dissemination" analysis is not about whether Liz Ald has demonstrated success in *other* works, or *in general*, but rather if the specific works at issue were widely disseminated. That being said, even if the #1 ranking book was Book 1, this still does not provide strong support for the access prong, because most of the alleged similarities with *Nightweaver* come from Book 2. *See* Aldrich Decl. Exs. 4, 5, 6. Plaintiff's lack of disaggregation between its books frustrates the analysis here.

Next, Plaintiff's assertion that Liz Ald had "1 million+ views for its 3-book YA series" is unclear because Plaintiff never fully published the entirety of *The Boy with the Beautiful Heart* ("Book 3") on Wattpad. *See* Compl. at 13-14. In another part of the Complaint, Plaintiff states that Liz Ald got "significant exposure for its works *in general* while on the site, with an estimate of over 1 million views of *Liz Ald-created material*." *Id*. ¶ 33 (emphases added). "Liz Ald-created material" could encompass more than just Book 1 and Book 2, including the first fantasy novel that it posted on Wattpad, in addition to possible others. In any case, even if Plaintiff meant that there were 1 million+ views from between just Book 1 and Book 2, it runs into the same problem addressed above: Plaintiff does not provide the allocation of those views between Book 1 or Book 2. If Book 1 received a significant majority of the reader views, then this weakens the

contention that Book 2, from which most of the alleged similarities derive, was widely disseminated. *See* Aldrich Decl. Exs. 4, 5, 6. Finally, the number of <u>views</u> may not be a good metric of widespread dissemination. Wattpad distinguishes between what it calls "Total Reads" ("the broadest measure of interest in [one's] story") and "Unique Readers" ("number of unique daily viewers").[4] There could be devoted fans who re-read parts of the works several times, and this all counts towards the "views" that the work has; the total number of views therefore does not necessarily speak to widespread dissemination, since it can be inflated if a small, but dedicated, fanbase frequently engage with the work.

Second, and relatedly, the expansive, popular nature of Wattpad can actually undermine the proposition that Plaintiff's works are widely disseminated. If there are indeed "over 650 million authored works on its site," Mot. at 12, it would be difficult to say that Plaintiff's works got much traction in a such a competitive, inflated internet environment. The greater the number of works available on Wattpad, the likelier that Plaintiff's works did not cut through and reach a level of prominence and dissemination. It's not enough that the *platform* (Wattpad) is widely used. Plaintiff's *works* have to be widely disseminated. As addressed above, there is no strong evidence that this was the case.

As to Plaintiff's argument that a "simple 'Google' search" would pull up Plaintiff's works, Mot. at 12, this assumes that anything *searchable* on the internet should be considered "widely disseminated." This position would make the "access" prong nearly meaningless, because almost anything can be found on the internet. The court in *Skidmore* recognized that the concept of access has been diluted through modern technology where "[g]iven the ubiquity of ways to access media online, from YouTube to

---

[4] *See Wattpad*, "Story Statistics FAQ," https://support.wattpad.com/hc/en-us/articles/4437003467924-Story-Statistics-FAQ (detailing the difference between "Total Reads" and "Unique Readers").

24-CV-02195-GPC-MSB

1    subscription services like Netflix and Spotify, access may be established by a trivial

2    showing that the work is available on demand". *Skidmore*, 952 F.3d at 068; *see also Lois*

3    *v. Levin*, 2022 WL 4351968, at *3-4 (C.D. Cal. Sept. 16, 2022) ("Courts within this

4    [Ninth] Circuit and our sister Circuits have consistently held that the mere availability of

5    a work online is insufficient to establish wide dissemination.") (collecting cases).  Here,

6    there is no other indication that, besides simply being part of the Internet, Plaintiff's

7    works reached a level of prominence and popularity to be considered widely

8    disseminated.  *Cf. Gray v. Perry*, 2020 WL 1275221, at *13 (C.D. Cal. Mar. 16, 2020)

9    (plaintiff presented evidence that the song at issue was played more than 6 million times,

10   was nominated for a Grammy, was performed at hundreds of concerts, and was ranked

11   highly on the Billboard charts for popular music).

12          Even more fatal to Plaintiff's argument is the issue of timing: Defendant Gray

13   could not have had access to Plaintiff's works if Gray had already finished much of her

14   work on *Nightweaver* before Plaintiff posted her material on Wattpad.  Gray asserts that

15   she effectively completed *Nightweaver* before Plaintiff began posting the works online.

16   Response at 15.  Gray declares that she started writing the book in January 2020, finished

17   a partial draft in October 2020, and then sent a complete manuscript to her editor in June

18   2022.  *See* Gray Decl. ¶¶ 12, 14.  Meanwhile, Plaintiff started to post chapters of Book 1

19   in January 2022 and posted chapters intermittently until July 2022.  Compl. ¶ 38.  As to

20   Book 2, Plaintiff did not even begin to post chapters until August 2022, which was

21   months after Gray had completed her *Nightweaver* manuscript and sent it to her editor.[5]

22

23

24   _____

25   [5] As discussed, this is particularly significant given that Defendants claim that all of the
     alleged plotline similarities are from Book 2, *see* Aldrich Decl. Ex. 5, and that the vast
26   majority of other similarities are also taken from Book 2, *see* Aldrich Decl. Exs. 4, 6.  To
     the extent that the timeline presented by Defendants is accurate, then Plaintiff has a
27

28

                                                  13

Gray Decl. ¶ 16.  Many of the allegedly infringing elements were present in the October 2020 partial draft and all were present in the complete June 2022 manuscript.  Gray Decl. ¶¶ 14, 16.

In turn, Plaintiff argues that Gray manipulated the manuscript "to make it appear like its creation pre-dated the Liz Ald works."  Compl. ¶ 62.  Defendants argue that this is merely speculation that is contradicted by the forensic evidence performed by their expert, who confirmed the each of the time-stamps of Gray's works.  Mueller Decl. ¶¶ 14-16.  Plaintiff disputes the expert's review, stating that the "files" that the expert examined "are not the actual attachments from Defendant Gray's emails."  Reply at 1.  It is unclear how Plaintiff has come to this conclusion.  In the expert's declaration, he clearly states that "[t]he three (3) emails and their respective three (3) *attachments* are a true copy of the original emails and *files* and attached as to this declaration as exhibits in Adobe Acrobat PDF format…"  Mueller Decl. ¶ 13 (emphases added).  The Court finds no reason to doubt this.

If Gray's timeline is accurate, then it would have been impossible for Gray, while writing *Nightweaver*, to have had access to portions of Plaintiff's Book 1 and *any* of Book 2, since these were not up on Wattpad.  And even if Book 1 and Book 2 had been on Wattpad before or during Gray's writing process, Plaintiff has not carried its burden to show that the two books were widely disseminated enough.

## 2. Striking similarities

Next, the Court will examine whether Plaintiff has proven enough "striking similarity" so that access can be presumed.  *See Lois*, 2022 WL 4351968, at *2 (citing *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1124 (9th Cir. 2018)).

---

weaker case against Gray, because Gray's entire manuscript was sent to her editor months before chapters of Book 2 even appeared on Wattpad.

1      Plaintiff must show a "probative or striking similarity [that] shows that the

2  similarities between the two works are due to 'copying rather than… coincidence,

3  independent creation, or prior common source.'" *Skidmore*, 952 F.3d at 1064 (citation

4  omitted).  "A finding of such similarity may be based on the overlap of unprotectable as

5  well as protectable elements."  *Id*. (citation omitted).

6      Plaintiff puts forward several charts that purport to list similarities between

7  *Nightweaver* and its works, Book 1 and Book 2.  *See* Aldrich Decl. Ex. 4 (similarities

8  concerning antagonists and family characteristics); Ex. 5 (similarities concerning

9  plotlines); Ex. 6 (similarities concerning specific scenes); Ex. 7 (similarities concerning

10 online marketing for the books).

11     The listed similarities are not "striking."  The most surprising similarities that

12 Plaintiff points out are easily distinguishable on a closer look: a scene involving

13 "surprising technology"[6] (Ex. 6, items 1 and 2), a memorial of a queen holding an infant[7]

14 (Ex. 6, item 4), the lead female's recognition of a pirate tattoo on the lead antagonist[8]

15 (Ex. 6, item 5), and the reveal scene where the lead female realizes her love interest is

16

17

18 _____

19

20 [6] In *Nightweaver*, the surprising technology was an automobile, which the protagonist's
   little sister squeals at, and the scene is contextualized by the protagonist's reflections on

21 how hard life has been for her family.  In Book 2, the surprising technology was a robot,
   which the protagonist herself squeals at, and the scene is set in a glass house, with only

22 the protagonist and her love interest present, and takes place during a flirty exchange.

23 [7] In *Nightweaver*, the memorial is of an ancient, legendary queen.  In Book 2, the

24 memorial is of the protagonist's love interest's mother.

25 [8] In Nightweaver, the protagonist's discovery of the tattoo on the antagonist (a depiction
   of a sparrow in flight) is wrought with anxiety because she realizes he is part of the group

26 that killed her brother.  In Book 2, the protagonist looks at the skull tattoo and,

27 "giggling," asks the antagonist, "What's the big deal? It's just a skull."

28

actually the enemy pirate[9] (Ex. 6, item 6).  And the rest of Plaintiff's examples do not come close to anything like "striking similarity."

Additionally, Plaintiff argues that *Nightweaver* is "filled with inconsistencies," like anachronistic technology, and the scarcity of pirate elements even though it is touted as "pirate book."  Mot. at 13.  Plaintiff argues that "[t]hese problems are due to *Nightweaver*'s reliance for its content on Plaintiff's work, which was not a pirate book." *Id*.  This is completely conclusory, with no legal or evidentiary support.  Internal inconsistences in a work do not indicate that copyright infringement is at work.

Plaintiff also alleges that Gray's manuscript showed "evidence of manipulation and fabrication probative of copying."  *Id*. at 14.  Alleged document manipulation has no place in the "strikingly similar" analysis.  This bears more on the "access" prong, which was addressed above.  To the extent that Plaintiff and Defendants dispute the forensic evidence presented by either side, that is a question best resolved later, not on a motion for preliminary injunction.

### B.    "Unlawful Appropriation" element

Plaintiff has also not established the second prong, "unlawful appropriation." Unlawful appropriation requires that the disputed works share substantial similarities. *See Skidmore*, 952 F.3d at 1064.  The Ninth Circuit uses a two-part test in order to determine substantial similarity: "the first part, the extrinsic test, compares the objective similarities of specific expressive elements in the two works" and "the second part, the intrinsic test, 'test[s] for similarity of expression from the standpoint of the ordinary

---

[9] In *Nightweaver*, Captain Shade saved the protagonist from a torturous ship, so he is not only an enemy pirate and the protagonist has a complicated relationship with him.  In Book 2, the protagonist only views the antagonist as a "leader of a terrorist group" once she discovers his true identity.

24-CV-02195-GPC-MSB

reasonable observer, with no expert assistance.'" *Id*. (citations omitted).  Both tests must be met in order for the works to be considered substantially similar.  *Id*.

### 1. Extrinsic test

The objective extrinsic test focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters and sequence of events" in the two works.  *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). In applying the extrinsic test, the court "break[s] the works down into their constituent elements, and compar[es] those elements for proof of copying as measured by substantial similarity."  *Masterson v. Walt Disney Co*., 821 F. App'x 779, 782 (9th Cir. 2020) (citation omitted).  "Because the requirement is one of substantial similarity to protected elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material in a plaintiff's work."  *Gray v. Hudson*, 28 F.4th 87, 96 (9th Cir. 2022).  Thus, "a court must filter out and disregard the non-protectible elements in making its substantial similarity determination."  *Cavalier v. Random House, Inc*., 297 F.3d 815, 822 (9th Cir. 2002).  This means that "familiar stock scenes," "themes that are staples of literature," and "scenes-a-faire" ("incidents that flow necessarily or naturally from a basic plot premise") are not protectible and must not be part of the "substantial similarity" analysis.  *Id.* at 823; *see Skidmore*, 952 F.3d at 1069 ("ideas, concepts, and common elements are excluded" as well as "commonplace elements that are firmly rooted in the genre's tradition" because "these building blocks belong in the public domain and cannot be exclusively appropriated by any particular author") (cleaned up).

Plaintiff has provided 58 instances of character similarities, 43 instances of plot similarities, and 99 instances of scene similarities.  *See* Aldrich Decl. Exs. 4, 5, 6 (respectively).  These supposed similarities do not persuade the Court.

Character similarities.  The 58 instances of character "similarities" do not convince the Court of substantial similarity.  Most of them relate to common themes, genre tropes,

24-CV-02195-GPC-MSB

and ideas that are not protected under copyright law: blue eyes, a stone fortress, a royal boy, meeting at night in a garden, twinkling eyes, etc. These ideas are much too "general of a similarity" to pass the extrinsic test. *Masterson*, 821 F. App'x at 782. Sometimes Plaintiff exaggerates the similarities between the works. For example, Plaintiff claims that each antagonist keeps "out of the public spotlight," but the passages show this "similarity" to be imprecise: compare "My brother and I are to remain out of the public spotlight until we turn twenty-one" (Book 2) with "he must be devastatingly handsome. Few have ever seen him face-to-mask." (*Nightweaver*). As another example, Plaintiff claims that both works have brothers who have "the ability to control multiple wolf dogs/wolves" because in Book 2, there is a character who has trained Siberian huskies; in *Nightweaver*, there is a character who has the magical ability to control wolves. Aldrich Decl. Ex. 4 at 8. Surely, this is stretching the similarity thin.

Plot similarities. Plaintiff also does not prove substantial similarity here. Many of its plotlines are generic tropes of the fantasy and romance genres: an independent teen heroine, a love triangle, an antagonist prince, a glamorous ball, a garden picnic, and an incidence of poisoning. Aldrich Decl. Ex. 5; *see* Gray Decl. ¶ 39 (detailing traditional elements of YA fantasy). These 43 plot similarities fail to go beyond the common elements found in young adult fantasy literature; they are not "the expression of a particular, copyrightable setting." *Van v. Cameron*, 2011 WL 13121345, at *3 (S.D. Cal. July 13, 2011).

Scene similarities. The 99 instances of "similarities" are replete with common phrases, verbs and adjectives, and idioms. As a particularly absurd example, similarity #86 compares "She blinked" (Book 2) with "He blinks" (*Nightweaver*). Aldrich Decl. Ex. 6 at 40. Another example (similarity #80): "His top lip curled into a snarl" (Book 2) and "Percy's lip curls into a snarl" (*Nightweaver*). *Id.* at 38. Plaintiff does not have any more ownership over the phrase "curl into a snarl" than does any other member of the

24-CV-02195-GPC-MSB

1    public.  This is not protectible work.  There are some examples of longer scenes, but they

2    suffer from the same flaw: they're full of scenes, themes, and vocabulary that are

3    common to the romance genre.  They are also not protectible.

4        Plaintiff also alleges that Gray used similar graphics and language in marketing her

5    book as Plaintiff did for its own works (e.g., roses and mention of a "foreign country").

6    The *marketing* of the works is not relevant to the copyright infringement analysis of the

7    *content* of the works.  Plaintiff provides no legal support to show otherwise.

8        Finally, Plaintiff asserts that there have been noted "inconsistencies" in Gray's

9    book and that Gray altered the manuscript to look like it pre-dated Plaintiff's works – and

10    that these bolster the infringement allegations.  But both of these arguments have already

11    been addressed and dismissed in the previous section, *see supra*.

12        The Court finds that Plaintiff fails to meet the extrinsic test because it cannot prove

13    substantial similarity based on the provided examples of non-protected ideas, common

14    themes, and scenes-a-faire.

15                2.  Intrinsic test[10]

16        The intrinsic test looks at whether there is a "similarity of expression from the

17    standpoint of the ordinary reasonable observer, with no expert assistance."  *Skidmore*,

18    952 F.3d at 1064.  Since Plaintiff fails to meet the extrinsic test, the Court does not need

19

20

21    _____

22    [10] Although the intrinsic test is left to a jury, the Court examines it here to see if Plaintiff

23    will be likely to prevail on the merits.  *See Chase-Riboud v. Dreamworks, Inc.*, 987 F.

24    Supp. 1222, 1226 n.4 (C.D. Cal. 1997) ("While the intrinsic test for expression is

      uniquely suitable for resolution by the trier of fact, the Court may properly consider the

25    intrinsic test at the preliminary injunction stage. The question before the Court is whether

      it is likely that Plaintiff will prevail on the merits or, in other words, persuade the jury

26    that there is substantial similarity of expression and that, therefore, Defendants have

27    infringed her work.") (cleaned up).

                                    19

28

to consider the intrinsic test, since both have to be met in order for unlawful appropriation to be found.  *See Cavalier*, 297 F.3d at 824.

In any case, Plaintiff's works (Book 1 and Book 2) and *Nightweaver* do not share substantial similarity in the 'total concept and feel.'"  *Chase-Riboud*, 987 F. Supp. at 1226 (citation omitted).  *Nightweaver* takes place in a supernatural world with magical, vampire-like creatures, while Plaintiff's story is at least partially set in the contemporary world of Connecticut.  Response at 21.  Aldrich's own declaration shows that the "feel" of the two works are very different.  *See* Aldrich Decl. ¶ 51 ("my book was a happy, wonderful world [readers] could disappear into" but Gray's story is "gruesome with stabbing, beheading, blood and death").  Thus, the Court finds that Plaintiff would likely fail on the merits based on the intrinsic test as well.

Because the determination of likelihood of success on the merits is a threshold inquiry, "when a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three *Winter* elements."  *Garcia*, 786 F.3d at 740 (cleaned up).  However, the Court here will go through each of the elements for the sake of completeness.

## I.    Irreparable harm

Irreparable harm must be shown by the plaintiff.  There is no rebuttable presumption of irreparable harm.  *See Puma SE v. Forever 21, Inc.*, 2017 WL 4771003, at *2 (C.D. Cal. June 2, 2017).  "Following *eBay* and *Winter*, [the Ninth Circuit] held that likely irreparable harm must be demonstrated to obtain a preliminary injunction in a copyright infringement case…"  *Herb Reed Enters., LLC*, 736 F.3d 1239, 1249 (9th Cir. 2013).  Thus, those "seeking injunctive relief must proffer evidence sufficient to establish a likelihood of irreparable harm."  *Id.* at 1251.

Plaintiff argues that it will suffer irreparable harm if a preliminary injunction is not granted because its reputation is harmed due to "the potential that purchasers of

1    Defendant Gray's work might believe Liz Ald is the infringer and not Defendant Gray."

2    Mot. at 20.  Plaintiff also argues that its goodwill with current and prospective readers is

3    "damaged in an ongoing sense so long as the infringing book is available for purchase."

4    *Id.*  Finally, Plaintiff also asserts that *Nightweaver* has led to customer confusion and

5    dilutes Plaintiff's brand, such that Plaintiff continues to "lose its market share and

6    competitive position in the YA novel market."  *Id*. at 21.

7         However, beside conclusory statements that it will suffer irreparable harm to its

8    reputation and goodwill, Plaintiff has not provided any actual evidence to support these

9    claims.  *See Gowan Co., LLC v. Aceto Agr. Chems*., 2009 WL 2028387, at *5 (D. Ariz.

10   July 10, 2009) ("Damages to goodwill and reputation have typically supported findings

11   of irreparable harm only where evidence clearly supports such damage.")  Given the fact

12   that *Nightweaver* has been on shelves for over a year, this absence – of any evidence of

13   consumer confusion or of Plaintiff's brand being diluted – is particularly striking.  As to

14   Plaintiff's claims that it will lose its market share, Plaintiff does not explain why this

15   harm cannot be addressed by potential monetary damages.

16        Plaintiff also argues that the allegedly infringing acts have caused "significant

17   emotional damage to Plaintiff's health and life-long love of writing."  Reply at 9.  It is

18   true that in general, emotional distress can constitute irreparable harm.  *See Chalk v. U.S.

19   Dist. Court. Cent. Dist. of Cal.*, 840 F.2d 701, 709 (9th Cir. 1988).  However, in the

20   context of copyright law, the Ninth Circuit in *Garcia* made clear that the irreparable harm

21   "must stem from copyright" and cannot be "too attenuated from the purpose of

22   copyright." *Garcia*, 786 F.3d at 745, 746.  The *Garcia* court therefore rejected the

23   plaintiff's claim of emotional distress as irreparable harm.  *Id.* at 744-45; *see also S.

24   California Rental Hous. Ass'n. v. Cnty. of San Diego*, 550 F. Supp. 3d 853, 870 (S.D.

25   Cal. 2021) (citing *Garcia* for the proposition that "assertions of emotional distress are not

26

27

28

24-CV-02195-GPC-MSB

cognizable irreparable harm for copyright claims because there is no cause of action for emotional distress under the Copyright Act").

Further, Plaintiff's delay in bringing this motion demonstrates that there is a lack of irreparable harm. *See Miller v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993) (plaintiff's "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm"). Plaintiff was aware of the existence of *Nightweaver* as early as March 2024, when it sent the cease-and-desist letter to Gray. It filed this motion for preliminary injunction in November 2024. While it may have been the case that Plaintiff filed this motion so late because it only recently discovered the alleged document manipulation by Gray, this still does not excuse Plaintiff's delay: if Plaintiff felt that *Nightweaver*'s existence on the shelves imminently imperiled its own works, then it would have pursued legal action, including injunctive relief, regardless of whether it believed Gray had manipulated her manuscript or not. This delay demonstrates the lack of immediacy and urgency that would normally accompany irreparable harm.

Accordingly, the Court finds that this element counsels against injunctive relief.

## II.    Balance of hardships

Plaintiff must also show that the balance of equities "tip" in its favor. *See Winter*, 555 U.S. at 20. The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24.

Plaintiff argues that its copyright holder rights "are being damaged in an ongoing sense and a preliminary injunction is the only way to avoid further harm to Plaintiff." Mot. at 22. A preliminary injunction would protect Plaintiff's exclusive rights to "control and profit from its protected work, specifically protecting Plaintiff's market share, brand reputation and any future licensing or customer sales opportunities." *Id*.

24-CV-02195-GPC-MSB

1    These are only the expected, general benefits of copyright law.  Plaintiff needs to

2  show more specifically how *it* has been harmed by *Nightweaver*'s existence in the

3  market.  However, as the Court found above, Plaintiff has not demonstrated with any

4  evidence that it will endure any irreparable harm if a preliminary injunction is not issued:

5  there is no evidence given that consumer confusion has been created by *Nightweaver* in

6  the YA marketplace or that Plaintiff has lost its control over its own work's quality.

7  "Balanced against the absence of any showing of irreparable harm to Plaintiffs, the

8  substantial harm to Defendants strongly weighs against the issuance of an injunction."

9  *Batts v. Adams*, 2011 WL 13217923, at *8 (C.D. Cal. Feb. 8, 2011).

10    Furthermore, Plaintiff downplays the harm that Defendant Hatchette would endure,

11  because according to Plaintiff, Hatchette is a large-scale publisher that "is not dependent

12  on only the sales of *Nightweaver*."  Mot. at 22.  A preliminary injunction would thus only

13  be a "minor inconvenience" for Hatchette.  *Id.*

14    Defendants paint an entirely different picture, arguing that a preliminary injunction

15  would cause substantial harm to Defendants and others in the publishing world.

16  According to Hatchette Senior Editor Alexandra Hightower, *Nightweaver* is the "lead

17  title" in Hatchette's winter/spring cycle, which means that it is the focus of the

18  company's marketing, publicity, and sales efforts, and Hatchette "will put a large portion

19  of the financial resources and labor allocated for the season" behind this title.  Hightower

20  Decl. ¶ 9.  In preparation for the March 2025 release date for its deluxe edition of

21  *Nightweaver*, Hatchette has already engaged in a six-figure marketing and publicity

22  campaign for the book, including printing 60,000 copes and more than 800 advance

23  copies, some of which have already been sent out.  *Id.* ¶¶ 9, 13, 15, 25.  There are over

24  1,000 preorders from readers (and counting).  *Id.* ¶ 23.  An injunction would cause the

25  loss of over $700,000, which includes reimbursement of the preorders, loss of expected

26  sales, cancellation of events, and loss incurred by the Hatchette editorial team.  *Id*. ¶ 25,

27

28

24-CV-02195-GPC-MSB

26.  Hatchette has already spent more than $150,000 to date on *Nightweaver*, which does not include overhead or Gray's significant advance.  *Id.* ¶ 26.

The stakes are higher because *Nightweaver* is envisioned as part of a trilogy. *Nightweaver*'s release date was "carefully selected to position the book well ahead of summer reading" and in order to publish the sequel within the same calendar year, "thus maximizing buzz and building excitement amongst fantasy readers."  *Id.* ¶ 12.  An injunction would "inflict reputational harm on the author and any depression of sales of this first novel will directly impact the success of the second and third books of this series that Hatchette has already contracted for."  *Id.* ¶ 28.  Hatchette's own reputation would take a hit, and compromise the careers of other authors published by Hatchette, and there would be ripple effects throughout the "entire ecosystem surrounding the YA market." *Id.* ¶¶ 29, 30.  Courts have found these harms to be cognizable.  *See Trust Co. Bank v. Putman Pub. Grp.*, Inc., 1988 WL 62755, at *3 (C.D. Cal. Jan. 4, 1988) (finding defendant's goodwill with retailers would be damaged and could impact sale of other books for months to come); *Wild,* 2013 WL 12137684, at *3 (finding defendant's ability to obtain shelf space for future novels would be endangered).

As for Gray, a delay in publishing *Nightweaver* could mean that Hatchette ultimately decides to cancel her contract and not publish any books in the series – which would have serious consequences on her personal finances.  Gray Decl. ¶¶ 41, 44.  Gray has already put in nearly five years and over $20,000 of her own money into writing, self-publishing, and marketing this book.  *Id.* ¶¶ 20, 41.  Now that she is at the cusp of new professional milestone, she faces an injunction that would threaten to damage her reputation in the YA and writing community and inflict "severe psychological damage." *Id.* ¶ 41.

Having accounted for the hardships that have been or will be incurred by both sides, the Court finds that Plaintiff here fails to show that the balance of hardships favors an injunction.

## III.    Public interest

While the public has a compelling interest in protecting copyright law and thereby protecting the incentive for people to create new works, *Golan v. Holder*, 565 U.S. 302, 328 (2012), the public also has an interest in the free expression of ideas.  This interest in free expression is most threatened by prior restraints, like injunctions, that take down or forbid speech.  *See Garcia*, 786 F.3d at 747.  In particular, "[t]he normal reluctance" against issuing a preliminary injunction is "particularly acute in a case such as this which deals with the publication of a book."  *Rosemont Enterprises, Inc. v. Random House, Inc*., 355 F.2d 303, 211 (2d Cir. 1966); *see Trust Co. Bank*, 1988 WL 62755, at *4 (noting the "strong public interest favoring the publication of books and novels").

The public has already shown a keen interest in the publication of *Nightweaver*, as shown by the preorders for the March 2025 release that have already been made.

The Court finds that the public interest is served by denying the motion for preliminary injunction.

## IV.    Bond

Because the Court denies Plaintiff's preliminary injunction, requiring a bond from Plaintiff is not necessary.

### CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for preliminary injunction.

**IT IS SO ORDERED.**

24-CV-02195-GPC-MSB

Dated:  January 28, 2025

Hon. Gonzalo P. Curiel
United States District Judge

24-CV-02195-GPC-MSB